## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSOCIATION OF AMERICAN RAILROADS,<br><br>    Plaintiff,<br><br>425 Third St. SW<br>Washington, DC 20024<br><br>        v.<br><br>DISTRICT OF COLUMBIA DEPARTMENT OF ENERGY AND ENVIRONMENT,<br><br>1200 First St. NE<br>Washington, DC 20002<br><br>  and<br><br>RICHARD JACKSON,<br>Director of the District of Columbia Department of Energy and Environment, in his official capacity,<br><br>1200 First St. NE<br>Washington, DC 20002<br><br>        Defendants. | No. 1:26-cv-1079 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Association of American Railroads ("AAR") alleges:

### INTRODUCTION

1.    Congress has long exercised broad regulatory authority over rail transportation.  The ICC Termination Act ("ICCTA") vests the federal government with "exclusive" jurisdiction over "transportation by rail carriers," and preempts state

legislation that would manage, govern, or discriminate against rail transportation. 49 U.S.C. § 10501(b). Similarly, the Hazardous Materials Transportation Act ("HMTA") prohibits States from imposing fees on rail shipments of hazardous materials unless the fee is "fair"—meaning the fee must be imposed equally on all competitive modes of transportation.

2. In violation of this comprehensive federal scheme, the District of Columbia's Department of Energy and Environment (the "Department") has issued a Rule imposing a "fee" on trains that enter or exit the District (the "Border Fee"). The Rule imposes a Border Fee of sixty cents ($0.60) for each railroad car that enters the District. It also imposes a Border Fee of sixty cents ($0.60) for each railroad car that exits the District. And it imposes a Border Fee of sixty cents ($0.60) for each railroad car that transits through the District without stopping. *See* Department of Energy and Environment, Notice of Final Rulemaking, *Railroad Carrier Fees*, 72 DCR 13177 (Nov. 28, 2025).

3. The Border Fee is uniquely imposed on railroads. Other competing modes of transportation—such as trucks—are not required to pay the Border Fee. The funds generated from the Border Fee are placed in the District of Columbia's Rail Safety and Security Fund and used to administer the District's rail safety and security program.

4. The Border Fee is preempted by federal law. The Border Fee is preempted by ICCTA because it manages and governs rail transportation and discriminates against railroads. The Border Fee is also preempted by the HMTA because the charge is not "fair," as the statute requires: It is assessed only against railroads and not against competing modes of transportation.

2

5.      The Border Fee also violates the Commerce Clause of the United States Constitution.  It assesses a charge at the very moment a train engages in interstate commerce by requiring a payment for every border crossing.  The Border Fee is a textbook example of a law that discriminates against and penalizes interstate commerce.

6.      Finally, the Border Fee violates the D.C. Administrative Procedure Act (DCAPA).  The Rule and the Border Fee are arbitrary and capricious because the Department did not offer a reasoned explanation for how it determined the amount, scope, and applicability of the fee.

7.      The Court should hold and declare the Rule preempted by ICCTA and/or the HMTA, invalid under the Commerce Clause, and unlawful under the DCAPA.  The Court should enjoin Defendants from implementing or enforcing the Rule and vacate the Rule in its entirety.

**PARTIES**

8.      Plaintiff Association of American Railroads is a nonprofit industry association whose members include all of the Class I freight railroads (North America's largest freight railroads), smaller freight railroads, and passenger and commuter railroads. AAR's members operate approximately 83 percent of the line-haul mileage, employ 95 percent of the workers, and account for 97 percent of the freight revenues of all railroads in the United States.  AAR and its members are committed to operating the safest, most efficient, cost-effective, and environmentally sound freight rail transportation system in the world.   AAR represents its member railroads in proceedings before Congress, administrative agencies, and the courts in matters of common interest, such as the issues

3

involved in this lawsuit.  AAR members, including CSX Transportation, Inc. (CSXT), operate in the District of Columbia.

9.    Defendant Department of Energy and Environment (the "Department") is an agency of Defendant District of Columbia.  The Department issued the Rule and collects the Border Fee.

10.    Defendant Richard Jackson is the Director of the District of Columbia Department of Energy and Environment, the Department that issued the Rule and collects the Border Fee.  He is sued in his official capacity.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction under 28 U.S.C. § 1331 because this case arises under the Constitution and laws of the United States, and raises substantial questions of federal law, including whether federal law preempts the Rule.  This Court has supplemental jurisdiction under 18 U.S.C. § 1367 to consider AAR's DCAPA claim because that claim arises from the same common nucleus of operative fact as AAR's federal claims.

12.    This Court may declare the legal rights and obligations of the parties in this action under 28 U.S.C. §§ 2201 and 2202 because this action presents an actual controversy within the Court's jurisdiction.

13.    This Court has personal jurisdiction over Defendants because they are domiciled in the District of Columbia.

14.    Venue is proper in this district under 28 U.S.C. § 1391(b), because all Defendants reside in this District and because a substantial part of the events and omissions giving rise to AAR's claims occurred in this District.

4

15.    AAR has associational standing to bring this suit on behalf of its members because several of those members, including CSXT, are directly and adversely affected by the Rule and thus would have standing to sue in their own right.  The interests that AAR seeks to protect through this lawsuit are germane to the organization's purpose, and neither the claims asserted nor the relief requested requires an individual member of AAR to participate in this suit.

## FACTS

### A.    Railroad Operations in the District of Columbia

16.    AAR's freight railroad members play a crucial role in the national and global economies, transporting vital commodities and other goods to industry, businesses, and consumers.  AAR's members are common carriers and, as such, are required under federal law to provide shippers with "transportation . . . on reasonable request."  49 U.S.C. § 11101(a).

17.    Freight railroads are committed to operating in a safe and environmentally sustainable manner.  Railroads are the safest form of surface transportation, the most fuel-efficient mode of freight transportation on land, and the safest above-the-ground mode of transportation for hazardous materials.

18.    Freight railroads operate highly sophisticated and interconnected rail networks.  For example, not only do AAR's members maintain their own expansive route networks, but their networks also connect to hundreds of short-line and other railroads as well as ports, intermodal terminals, rail-truck transfer facilities, industrial sites and

5

warehouses, and more. These rail networks are interstate—and even international—in scope.

19. Freight railroads depend upon a predictable and uniform national regulatory scheme for their operations. Requiring AAR's members to comply with a patchwork of state-by-state regulations in the context of their national rail networks would be costly, burdensome, impractical, and in many cases simply impossible.

20. AAR's members operate in the District of Columbia as part of their interstate rail networks. CSXT, for example, has just under 37 miles of mainline track and a railyard in the District. Its operations have achieved a remarkable level of safety. In the 3 years preceding this rulemaking, CSXT moved several million railcars through the District—and had only one incident that was significant enough to be reported to the Federal Railroad Administration. CSXT's operations in the District are an inseparable part of the larger North American transportation network, moving freight throughout the United States and beyond. And AAR member Norfolk Southern Railway has trackage rights through the District.

21. Pursuant to their common carrier obligation, freight railroads carry hazardous materials on their national route networks, including in the District of Columbia.

22. Freight railroads have a long history of transporting hazardous materials safely and efficiently, in a manner that is compliant with applicable laws and regulations, environmentally responsible, and responsive to concerns by community members and other stakeholders. Freight railroads invest heavily in their infrastructure and the development of new technologies to maintain and improve the safety of their operations,

with respect to all commodities, including hazardous materials. *See* AAR, *FRA Data Confirm Freight Rail Achieved Record Safety Performance in 2025* (Mar. 4, 2026), https://www.aar.org/news/fra-data-confirm-freight-rail-achieved-record-safety-performance-in-2025 (describing "sustained progress driven in part by expanded deployment of automation, advanced monitoring systems, and data-informed operating practices designed to reduce risk and support frontline employees"). Freight railroads, in cooperation with shippers and other stakeholders, use industry best practices when transporting hazardous materials. Rail containers securing hazardous materials must adhere to special requirements, and less reliable methods of securement are prohibited.

23. As a result of these investments and practices, hazmat accident rates are down 75% nationwide since 2005, with recent years having the lowest rates on record. AAR, *Freight Rail Facts & Figures* (last accessed Mar. 9, 2026), https://www.aar.org/wp-content/uploads/2023/04/AAR-Facts-Figures-Fact-Sheet.pdf. Today, "[m]ore than 99.99% of all hazmat moved by rail reaches its destination without a release caused by a train accident." *Id*.

24. The same safety record holds in the District of Columbia. According to the United States Pipeline and Hazardous Materials Safety Administration, *zero* hazardous material incidents involving rail were reported in the District of Columbia over the five-year period from January 1, 2021 to January 1, 2026. *See* U.S. Pipeline and Hazardous Materials Safety Administration, *Hazmat Summary by Incident State* (last accessed Mar. 9, 2026), https://portalpublic.phmsa.dot.gov/analytics/saw.dll?Dashboard).

**B.    The Department Enacts the Rule**

25.    On June 24, 2022, the Department published a Notice of Proposed Rulemaking in the *District of Columbia Register*.  69 DCR 7434.  The Department proposed imposing a per-car Border Fee on trains every time they enter the District, exit the District, or pass through the District without stopping.  CSXT submitted comments objecting to the proposed rule on multiple grounds.

26.    On July 25, 2025, the Department published a Notice of Second Proposed Rulemaking in the *District of Columbia Register*.  72 DCR 8292.  The Department made no material changes to the proposed rule, other than adjusting the amount of the per-car Border Fee from 75 cents to 60 cents per car.  In the preamble to the proposed rule, the Department addressed CSXT's comments and rejected the arguments that ICCTA or the HMTA preempts the Border Fee.  72 DCR at 8293–96.

27.    On November 28, 2025, the Department published a Notice of Final Proposed Rulemaking in the *District of Columbia Register*.  72 DCR 13177.  The final rule did not differ from the version of the rule published in the Notice of Second Proposed Rulemaking.

28.    The Rule adds a new Chapter 50, entitled "RAILROAD CARRIER FEES," to Title 20 of the District of Columbia Municipal Regulations, entitled "ENVIRONMENT."

29.    The Rule states that "[t]he purpose of this chapter is to establish fees to be paid by railroad carriers that will be used to administer and manage expenses of the rail safety and security programs for railroad operations in the District."  § 5000.1.  Beginning on June 1, 2026, every railroad operating in the District must report to the Department "the

number of railroad cars under the railroad carrier's control that have entered and exited the District during the preceding calendar year." § 5001.1.

30. The Rule imposes a per-car Border Fee on railroads operating in the District. Section 5002 provides:

**5002        IMPOSITION AND CALCULATION OF FEE**

5002.1        There is imposed on each railroad carrier operating in the District a fee of sixty cents ($0.60) for each railroad car that enters the District and sixty cents ($0.60) for each railroad car that exits the District, except as provided in §§ 5002.2 and 5002.3.

5002.2        There is imposed on each railroad carrier operating in the District a fee of sixty cents ($0.60) for each railroad car that transits through the District without stopping in the District.

5002.3        The fee imposed on a railroad carrier for each commuter railroad car that enters the District shall be sixty cents ($0.60), but no fee shall be imposed based on the commuter railroad car's exit from the District.

31. The Rule provides that the Department, no later than August 1 of each year, shall "notify each railroad carrier operating in the District of the amount of that railroad carrier's fee that is due and payable to the District by sending a notice of assessment to the railroad carrier." § 5003.1. The assessed rail carriers, by no later than November 1 of each year, "shall . . . pay to the Department the amount stated in the notice of assessment." § 5004.1.

32.    The Border Fee consists of flat charges imposed per railroad car entering, exiting, or transiting through the District of Columbia.  The Border Fee does not vary based on the mileage or distance traveled within the District, but is imposed based solely on the interstate character of the journey.

33.    The Border Fee does not apply to other forms of interstate transportation, like trucks.  Upon information and belief, the District of Columbia does not impose any similar charge on trucks entering or exiting the District.  Nor does the Border Fee apply to *intra*state transportation.

## NECESSITY FOR EQUITABLE RELIEF

34.    AAR and its members will suffer irreparable harm absent an injunction. Requiring AAR's members to comply with the Rule will make their services less economically competitive and damage their relationships with their customers.  In addition to lost revenue and profits, AAR's members will experience damage to goodwill that will be difficult to restore.  They will also suffer the violation of their constitutional rights. Injunctive relief is appropriate because AAR's members have no adequate remedy at law for these harms.  Enjoining the Rule would also serve the public interest by protecting the national system of rail transportation and upholding the Constitution's guarantee of the supremacy of federal law and protection of interstate commerce from local regulation.

## CLAIMS FOR RELIEF

35.    As to the following claims for relief, AAR incorporates all preceding paragraphs by reference.

## Count One
### ICCTA Preemption

36.    The ICC Termination Act ("ICCTA") vests the federal government—specifically the Surface Transportation Board—with "exclusive" jurisdiction over "transportation by rail carriers," and "preempt[s] the remedies provided under . . . State law." 49 U.S.C. § 10501(b).  ICCTA preempts the Border Fee in at least two ways.

37.    *First*, ICCTA categorically "preempts all state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation." *Delaware v. Surface Transp. Bd.*, 859 F.3d 16, 18 (D.C. Cir. 2017) (quotation marks omitted).  One way a state law manages or governs rail transportation—indeed, the paradigmatic way—is by manipulating the economics of railroads: "[E]conomic regulation is at the core of ICCTA preemption"; ICCTA "reflects a '[f]ederal policy of occupying the entire field of economic regulation of the interstate rail transportation system' and establishes 'the direct and complete pre-emption of State economic regulation of railroads.'" *Elam v. Kansas City S. Ry. Co.*, 635 F.3d 796, 805–06 (5th Cir. 2011) (quoting H.R. Rep. No. 104-311, at 95–96).

38.    ICCTA categorically preempts the Rule because the Rule has the effect of managing and governing rail transportation.  The Rule directly regulates trains moving in interstate commerce by assessing a per-car Border Fee on railroads that operate in the District.  By charging railroads for crossing the District's border, the Border Fee alters the economics of routing decisions and interstate movements—disincentivizing interstate

travel through the District and "risk[ing] the balkanization and subversion of the Federal scheme of minimal regulation." *Elam*, 635 F.3d at 805 (quotation marks omitted).

39.    *Second*, ICCTA categorically preempts state laws that discriminate against railroads or "targe[t] the railroad industry" by "apply[ing] exclusively and directly to railroad activity." *Delaware*, 859 F.3d at 19, 22 (quotation marks omitted). "[F]or a state regulation to pass muster, it must address state concerns generally, without targeting the railroad industry." *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 254 (3d Cir. 2007).

40.    ICCTA categorically preempts the Rule because the Rule discriminates against railroad transportation by targeting and singling out railroads, "apply[ing] exclusively and directly to railroad activity." *Delaware*, 859 F.3d at 22 (quotation marks omitted). The railroads' competitors—including trucks—are not subject to the Border Fee. The Border Fee is not a charge of general applicability. Rather, it is a railroad-only charge that is discriminatory on its face and therefore preempted.

41.    Because the Rule is preempted by ICCTA, AAR has an equitable cause of action to enjoin its enforcement.

**Count Two**
**HMTA Preemption**

42.    The HMTA generally preempts state efforts to regulate the transportation of hazardous materials. Under the HMTA's express preemption provision specifically governing state imposition of "Fees," a State "may impose a fee related to transporting hazardous material only if [1] the fee is fair and [2] used for a purpose related to

12

transporting hazardous material, including enforcement and planning, developing, and maintaining a capability for emergency response." 49 U.S.C. § 5125(f).

43.    The HMTA's preemption provision applies to the Rule because the Border Fee is "related to transporting hazardous material." 49 U.S.C. § 5125(f). The statutory authority under which the Rule was promulgated confirms this relationship. The Department invoked its authority under D.C. Code § 8-151.10(c) to impose charges on railroads to cover the costs of the District's "emergency response, rail safety, and rail security programs." 72 DCR at 8292. D.C. law defines these programs to include the establishment of an Emergency Response and Rail Safety Division, which is tasked with "[c]oordinat[ing] and conduct[ing] emergency response to spills and releases of substances and pollutants within the District and District waters." D.C. Code § 8-151.06(7)(B). Moreover, charges imposed under § 8-151.10(c) "shall be deposited into" the District's "Rail Safety and Security Fund." D.C. Code § 8-151.08h(b); *see* 72 DCR at 8292. The Rail Safety and Security Fund funds the Department's enforcement of federal railroad safety laws, including the HMTA. *See* D.C. Code § 8-151.08f (authorizing inspection of railroads under federal railroad safety laws); *id.* § 8-151.01(5B) (defining "federal railroad safety laws" to include "[t]he Hazardous Materials Transportation Act . . . as it pertains to shipment or transportation by railroad").

44.    The HMTA preempts the Rule because the Border Fee is not "fair." The test for whether a fee is "fair" is whether it is imposed equally on competitive modes of transportation. *See BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 766 (9th Cir. 2018) (holding that state fee related to the transportation of hazardous materials

13

"is unfair" when "it imposes a burden on railroads that it does not impose on the trucking industry"). In responding to comments on the proposed rule, the Department disputed that the Border Fee is "related to transporting hazardous material," but it did not claim that the fee would not be "fair" under the HMTA. 72 DCR at 8294–95. Nor could the Department dispute that it is unfair to assess railroads but not trucks, because there are "risks, and associated costs, of hazardous materials spills . . . for both rail and trucking." *BNSF Ry. Co.*, 904 F.3d at 766.

45.     Because the Rule violates and is preempted by the HMTA, AAR has a cause of action to enjoin its enforcement.

## Count Three
### Commerce Clause

46.     The Commerce Clause prohibits states (and the District of Columbia) from discriminating against interstate commerce. "State laws discriminating against interstate commerce on their face are virtually *per se* invalid." *Fulton Corp. v. Faulkner*, 516 U.S. 325, 331 (1996) (quotation marks omitted). A "law is discriminatory if it taxes a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State." *Oregon Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S. 93, 99 (1994) (quotation marks omitted).

47.     State charges on the movement of goods across state lines "penalize . . . travel within the free trade area" guaranteed by the Commerce Clause and have the "inevitable effect" of "threaten[ing] the free movement of commerce by placing a financial barrier around the State." *Am. Trucking Ass'ns, Inc. v. Scheiner*, 483 U.S. 266, 284 (1987). If

14

"each State imposed flat taxes for the privilege of making commercial entrances into its territory, there is no conceivable doubt that commerce among the States would be deterred"—"obviously divid[ing] and disrupt[ing] the market for interstate transportation services." *Id.* at 284–85.

48.    The Rule violates the Commerce Clause because it assesses a charge every time a train crosses the District's border.  A border toll is a textbook example of a Commerce Clause violation because, by definition, it penalizes interstate commerce but not intrastate commerce.  The Rule discriminates against interstate commerce on its face because it imposes charges on a rail car only when it crosses state lines.  "[I]ndividuals injured by state action that violates" the Commerce Clause's "self-executing limitation on the power of the States to enact laws imposing substantial burdens on [interstate] commerce . . . may sue and obtain injunctive and declaratory relief." *Dennis v. Higgins*, 498 U.S. 439, 447 (1991).

**Count Four**
**D.C. Administrative Procedure Act**

49.    The D.C. Administrative Procedure Act authorizes a court reviewing agency action to "hold unlawful and set aside any action" that is, among other things, "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "[c]ontrary to constitutional right, power, privilege, or immunity"; "[i]n excess of statutory jurisdiction, authority, or limitations or short of statutory jurisdiction, authority, or limitations or short of statutory rights"; or "[u]nsupported by substantial evidence in the record of the proceedings before the Court."  D.C. Code § 2-510(a).  While there are "slight differences

15

in language between" the federal APA and the DCAPA, "the two provisions were intended to be interpreted virtually identically." *Lee v. D.C. Bd. of Appeals & Review*, 423 A.2d 210, 216 (D.C. 1980).

50.    The Rule violates the DCAPA because it is unconstitutional under the Commerce Clause and because Defendants lacked statutory authority to promulgate the Rule given the preemptive effect of ICCTA and the HMTA. *See* D.C. Code § 2-510(a)(3)(B), (C). The Rule is also arbitrary and capricious because the Department failed to consider alternatives and failed to provide a reasonable explanation for how it decided the amount and applicability of the Border Fee.

**Count Five**
**Declaratory Relief Under 28 U.S.C. § 2201**

51.    This action presents an actual case or controversy between AAR and Defendants concerning the validity and enforceability of the Rule.

52.    Because the Rule violates federal law, D.C. law, and the Constitution, AAR seeks and is entitled to a declaration under 28 U.S.C. § 2201 that the Rule is invalid and unenforceable for the reasons stated above.

**Count Six**
**Injunctive Relief Under The Court's Equitable Powers**

53.    If AAR succeeds on the merits of its claims, it is entitled to injunctive relief against Defendants, whose enforcement of the Rule against AAR's members would conflict with and violate federal law and the Constitution.

54.    AAR's members would suffer irreparable harm for which they have no adequate remedy at law if the Rule were not enjoined.

16

55.     The balance of harms and the public interest weigh heavily in favor of injunctive relief given the illegality and unconstitutionality of the Department's actions as well as the strong safety record of railroads in the District.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff AAR respectfully requests that the Court:

A. Declare that the Rule violates the United States Constitution, federal law, and D.C. law;

B. Enjoin Defendants, as well as Defendants' officers, agents, servants, employees, and attorneys, and those persons acting in concert or participation with them, from taking any action to enforce the Rule against AAR or its members;

C. Hold unlawful and set aside the Rule in its entirety; and

D. Grant AAR any other relief this Court deems just and proper.

Dated:  March 30, 2026

*/s/ Thomas H. Dupree Jr.*
Thomas H. Dupree Jr. (DC Bar No. 467195)
Connor P. Mui (DC Bar No. 90009004)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street NW
Washington, DC 20036
(202) 955-8500
tdupree@gibsondunn.com
cmui@gibsondunn.com

**Attorneys for Plaintiff
Association of American Railroads**

17